No. 95-368

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996 .

IN THE MATTER OF THE ESTATE
OF THE DERN FAMILY TRUST AND
CLIFFORD DERN, Deceased,

MARY R. DERN,

    Plaintiff, Respondent,
    and Cross-Appellant,

    v.

DERRIL DERN, DARLENE ADAMS,
JANICE COPLEY, and BEVERLY TUBBS,

    Defendants, Counterclaimants,
    and Appellants.

FILED

NOV 14 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Eleventh Judicial District,
    In and for the County of Flathead,
    The Honorable Ted O. Lympus, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Roger M. Sullivan, McGarvey, Heberling, Sullivan &
        McGarvey, Kalispell, Montana

    For Respondent:

        Steven E. Cummings, Donald R. Murray, Murphy,
        Robinson, Heckathorn & Philips, Kalispell, Montana

Submitted on Briefs: October 17, 1996

Decided: November 14, 1996

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

Appellants Derril Dern, Darlene Adams, Janice Copley, and Beverly Tubbs (collectively, the Dern children) appeal from the September 20, 1993 order denying their Motion for Summary Judgment, from the May 17, 1994 Findings of Fact and Conclusions of Law, and from the April 21, 1995 Supplemental Findings of Fact, Conclusions of Law and Judgment of the District Court for the Eleventh Judicial District, Flathead County. The Dern children appeal the District court's conclusions that there was nothing in Clifford Dern's Separate Trust Estate with which to fund the $10,000 bequests to each of the Dern children; that the fourth Trust Minute constituted a valid and enforceable amendment to the Dern Family Trust; and that Mary Dern did not breach her fiduciary duties in the administration of the Trust as trustee. The Dern children also appeal the District Court's valuation of the respective interests in the Family Bypass Trust.

Respondent Mary Dern cross-appeals from the May 17, 1994 Findings of Fact and Conclusions of Law and from the April 21, 1995 Supplemental Findings of Fact, Conclusions of Law and Judgment denying her costs and attorney's fees. We affirm in part and reverse in part.

We consider the following issues on appeal:

1. Did the District Court err in characterizing Clifford and Mary Dern's joint bank accounts and Certificates of Deposit as part of the Marital Trust Estate of the Dern Family Trust?

2. Did the District Court err in determining that the fourth

2

Trust Minute was a validly executed amendment to the Trust document?

3.  Did the District Court err in determining the parties' interests in the Family Bypass Trust?

We also consider the following issue on cross appeal:

4.  Did the District Court err in denying Mary Dern her costs and attorney's fees?

## Factual and Procedural Background

This appeal involves the disposition of real and personal property from the Dern Family Trust (the Trust), a revocable living trust, on the death of Clifford Dern (Clifford), a settlor. The Dern children, are Clifford's adult children from a previous marriage. Mary Dern (Mary), is Clifford's surviving spouse and co-settlor and a trustee of the Trust.

At the time of Clifford's and Mary's marriage in 1976, Clifford was 65 years of age and Mary'was 62 years of age. Each had adult children from previous marriages.

In 1990, Clifford and Mary purchased the Trust documents from William W. Thompson (Thompson), an agent of American Family Living Trusts. American Family, a California corporation, had been previously enjoined from selling trusts in the state of Washington and Thompson's license to sell insurance had been revoked by the state of Idaho due to his deceitful conduct in the sale of revocable trusts. Clifford and Mary learned of American Family through mail solicitation.

Clifford and Mary were the settlors and initial trustees of

3

the Trust. Clifford's son, Derril, was the first successor trustee of Clifford Dern.

The Trust classified property as either "marital" or "separate." Marital property transferred to the Trust would become 'part of the Marital Trust Estate and would go to the surviving spouse on the death of either settlor. Separate property of either settlor transferred to the Trust would become part of the Separate Trust Estate and would be distributed according to the Trust with any residue going into the Family Bypass Trust. The Family Bypass Trust named the surviving spouse as the income beneficiary and the surviving spouse, together with the descendants of Clifford and Mary as the principal beneficiaries.

Clifford's Separate Trust Estate provided that his real property (which included two 160-acre parcels of timber, one-half of a 360-acre parcel of timber, and the 120-acre farm on which he and Mary lived) to be distributed among his four children if he predeceased Mary. Mary owned property that was held in joint tenancy with her two children that was never transferred to the Trust. The Trust further provided that the trustee distribute from Clifford's Separate Trust Estate, $10,000 to each of the Dern children.

After the Trust was created, Clifford and Mary transferred five bank accounts and Certificates of Deposit to the Trust. At the time of Clifford's death, these accounts totaled $73,922.77.

On November 14, 1991, Clifford and Mary deeded five parcels of real property to the Trust by means of a quitclaim deed, properly

4

executed and recorded November 15, 1991. In addition they amended the Trust by use of four Trust Minutes, specifying the beneficiaries of each of the parcels of property. These properties included the four parcels owned by Clifford and left to his children by way of the Separate Trust Estate in the original Trust document, and a farm acquired by Mary prior to her marriage to Clifford.

The first three Trust Minutes left Mary's farm to her two children, Clifford's two 160-acre parcels of timberland to his daughters, and one-half of the 360-acre parcel to Clifford's son. These parcels were necessarily removed from the assets of Clifford's Separate Trust Estate as they were specifically bequeathed through the Trust Minutes. These three Trust Minutes are not in dispute. The fourth Trust Minute left the 120-acre farm, then occupied by Clifford and Mary, to Mary. The fourth Trust Minute was signed by Clifford alone as were the second and third Trust Minutes leaving Clifford's other properties to his children. The validity of this fourth Trust Minute is disputed.

By the time Clifford and Mary signed the Trust Minutes Clifford had been suffering from several serious health problems for several months. Clifford died on December 9, 1991, after undergoing heart catheterization.

After Clifford died, Thompson went over the Trust with Mary and Clifford's children. Mary signed deeds as trustee of the Trust conveying the real estate in the manner provided for in the Trust. At that time she had not consulted a lawyer and did not realize

5

that the Trust provided that Derril would succeed Clifford as co-trustee of the Trust, and that, consequently, his signature was required on the deeds.  After she consulted an attorney, new deeds were prepared for both Mary's and Derril's signatures.  Derril refused to sign the deeds and this litigation ensued.

The Dern children appeal the District Court's conclusion that Clifford's one-half interest in various bank accounts constituted part of the Marital Trust Estate and was therefore not available to satisfy the $10,000 bequests.  They also appeal the District Court's conclusion that the fourth Trust Minute, leaving the farm to Mary, was a validly executed amendment to the Trust.

<u>Standard of Review</u>

The standard of review of a district court's findings of fact is whether they are clearly erroneous.  Daines v. Knight (1995), 269 Mont. 320, 324, 888 P.2d 904, 906 (citing Columbia Grain Intern. v. Cereck (1993), 258 Mont. 414, 417, 852 P.2d 676, 678).

This Court adopted a three-part test in Interstate Production Credit v. DeSaye (1991), 250 Mont. 320, 820 P.2d 1285, to determine whether the findings are clearly erroneous.  This test provides:

> First, the Court will review the record to see if the findings are supported by substantial evidence. Second, if the findings are supported by substantial evidence, we will determine if the trial court has misapprehended the effect of evidence.  [Citations omitted.] Third, if substantial evidence exists and the effect of the evidence has not been misapprehended the Court may still find that "[a] finding is 'clearly erroneous' when, although there is evidence to support it, a review of the record leaves the court with the definite and firm conviction that a mistake has been committed." [Citations omitted.]

<u>DeSaye</u>, 820 P.2d at 1287.  See also <u>Daines</u>, 888 P.2d at 906.

The standard of review of a district court's conclusions of law is whether the court's interpretation of the law is correct. Carbon County v. Union Reserve Coal Co., Inc. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686. See also Kreger v. Francis (1995), 271 Mont. 444, 447, 898 P.2d 672, 674; Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603-4.

## Issue 1

Did the District court err in characterizing Clifford and Mary Dern's joint bank accounts and Certificates of Deposit as part of the Marital Trust Estate of the Dern Family Trust?

The Dern children contend that Clifford's share in the various bank accounts and Certificates of Deposit (CDs) is a part of Clifford's Separate Trust Estate and is thus available for partial satisfaction of the $10,000 bequests to each of his children. The Declaration of Trust distinguishes between the marital property and the separate property of Clifford and Mary and provides in part:

> Any marital property of Clifford Dern and Mary R. Dern transferred to the trust shall remain marital property after its transfer and shall be called the "marital trust estate." . . . Either Clifford Dern's or Mary R. Dern's separate property transferred to the trust shall be called the "separate trust estate" with reference to the contributing settlor.

Trust, Article 1, page 1.

This definition is circular and not very helpful in distinguishing between marital and separate property. The sentence immediately following this definition is the only further direction given by the Trust regarding whether property is to be characterized as "marital" or "separate". The Trust provides: "Any 'real property' held by Clifford Dern and Mary R. Dern as

7

'joint tenants' shall be considered 'transmutted' [sic] to marital property for purposes of trust establishment." Clifford and Mary held no real property in joint tenancy. The Trust is silent as to the treatment of jointly held personal property.

Because the Trust is ambiguous as to the terms "marital property" and "separate property," extrinsic evidence is admissible to aid in determining the settlors' meaning of the terms and their intent in distributing their property through the Trust. "Where an ambiguous term is used, the intent of the parties will govern its construction and extrinsic evidence can be used to discover that intent." Ellingson Agency, Inc. v. Baltrusch (1987), 228 Mont. 360, 365, 742 P.2d 1009, 1012 (quoting Adams v. Chilcott (1979), 182 Mont. 511, 517, 597 P.2d 1140, 1144). This principle applies to the construction of both wills and trusts. Matter of Estate of Flasted (1987), 228 Mont. 85, 90, 741 P.2d 750, 753; § 72-33-106 MCA.

In determining the settlors' intended meaning of "marital" and "separate" property, the words should be taken in their ordinary meaning. "The words of a will are to be taken in their ordinary and grammatical sense, unless a clear intention to use them in another sense can be collected and that other can be ascertained." Section 72-11-302, MCA (repealed 1993). Although this statute was repealed in 1993 it was controlling when Clifford and Mary executed the Trust in 1990. The Trust provides some guidance to the interpretation of the terms "marital" and "separate." The status the property had before being transferred to the Trust dictated the

status it would have once it became part of the Trust. Hence "marital property" transferred to the Trust would become part of the Marital Trust Estate. Thus, the status of the bank accounts before transfer to the Trust determines their status within the Trust.

The parties agree that the four Norwest accounts were joint tenancy accounts, with Clifford and Mary each having a one-half interest in the funds in the accounts before the accounts were transferred to the Trust. The dispute as to the Norwest accounts arises over whether Clifford's share in the accounts constituted marital property or separate property. The fact that Clifford had an equal share in the accounts does not necessarily result in Clifford's share being characterized as separate property.

Because the Trust does not define what property constitutes marital property or separate property, the intent of the parties to the agreement must be discerned. In its May 17, 1994 Findings of Fact and Conclusions of Law the District Court found that:

> It was the intention of Clifford and Mary, settlors of the Dern Family Trust, to allocate to "marital trust property" all accounts and deposits which they held jointly and to which they had both made contributions during their fifteen and one-half year marriage.

The District Court found and the record indicates that the Derns treated their checking and savings accounts as marital property. Upon Clifford's request, Mary retired from nursing when they were married and thereafter helped out on the farm. After their marriage, Mary Dern's name was placed on a savings account and a checking account that Clifford had maintained with his former

9

wife.    At the time Mary's name was placed on the **accounts the**
savings account had an approximate balance of $30,000, and the
checking account had an approximate balance of $27,000.  During the
marriage, Clifford and Mary placed funds generated from farming and
logging into the checking and savings accounts as well as into
jointly-held CDs.  They combined the crops from both Mary's and
Clifford's farms, then sold the crops and placed the proceeds in
either a joint household checking account or a joint CD.

The record clearly supports the District Court's determination
that Clifford and Mary regarded the Norwest accounts as marital
property throughout their marriage, including the point at which
the accounts were transferred to the Trust. As such these accounts
became part of the Marital Trust Estate.

There is a dispute over whether Clifford's interest in the
Whitefish Credit Union account should be considered marital
property or separate property.  The parties also disagree as to
whether that account was held in joint tenancy or as tenants in
common.  However, since the Trust does not mandate that personal
property held in joint tenancy become part of the Marital Trust
Estate, or that personal property held as tenants in common become
part of the Separate Trust Estate, the type of cotenancy is not
dispositive as to the characterization of Clifford's interest in
the Whitefish account.  *Cf.* Clark v. Clark (1963), 143 Mont. 183,
387 P.2d 907 (holding that a joint interest is not necessarily
limited to the estate of joint tenancy).

The District Court found that the circumstances surrounding

10

the opening and use of the Whitefish account indicated that it was a joint account to be treated as marital trust property. The source of the initial deposit was crop proceeds generated from both Clifford's and Mary's farms. The bank issued the passbook and monthly statements of account in both Clifford's and Mary's names. The District Court's conclusion that this account was marital property before transfer to the Trust, and thus part of the Marital Trust Estate, is correct.

Accordingly, we affirm the District Court's conclusion that Clifford's interest in both the Norwest accounts and the Whitefish account was part of the Marital Trust Estate as opposed to the Separate Trust Estate and therefore unavailable to fund the $10,000 bequests to the Dern children.

<u>Issue 2</u>

Did the District Court err in determining that the fourth Trust Minute was a validly executed amendment to the Trust document?

The fourth Trust Minute allocated the 120-acre farm and the farm equipment to Mary upon Clifford's death. This Trust Minute was signed by Clifford alone. The Dern children contend that this fourth Trust Minute was not a validly executed amendment to the Trust.

The provisions of the Trust pertinent to this issue are as follows:

Major modifications of your trust should be accomplished through formal amendments, many of the minor actions you wish to take can be accomplished through your Trust Minutes.

Trustee Instructions, page 2.

11

Amendment During Settlors' Lives: Clifford Dern and Mary R. Dern acting together may at any time during their joint lives amend any of the terms of this trust by a written document delivered to the trustee or including such amendment in the Minutes of Trust. [Emphasis added.]

Trust, Article 2, page 3.

Attention Trustees and Successor Trustees: This is a record of the Dern Family Trust, referred to as Trust Minutes. These Trust Minutes are instructions to successor trustees on the distribution desires of Clifford Dern and/or Mary R. Dern. Each item included below, provided each is sisned and dated by the Settlors, constitutes an important element of this revocable livina trust, established on December 22, 1989. [Emphasis added.]

Trust Minutes, page 1.

It is black-letter law that in the construction of an instrument, "[w]here there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." Section 1-4-101, MCA. Moreover, the provisions of 'the Trust control as to the requirements for modification. See § 72-33-403, MCA; Hauseman v. Koski (1993), 259 Mont. 498, 501, 857 P.2d 715, 717.

It is undisputed that the settlors are Clifford and Mary. We assume, without necessarily agreeing, that the fourth Trust Minute was a minor modification of the Trust and the Trust could, thus, be amended, through the Trust Minutes. Reading all of the above provisions together so as to give effect to all, as required by § 1-4-101, MCA, it is clear from the Trustee Instructions that to amend the Trust, the settlors, Clifford and Mary, were required to act together and that, from the instructions to the Trust Minutes, both settlors were required to sign and date any such Trust Minute.

12

This is the only interpretation of the Trust language that will give effect to all of the above provisions. To the contrary, ignoring the requirement for both settlors' signatures set forth in the instructions to the Trust Minutes, would violate § 1-4-101, MCA, by failing to give any effect to that provision in the Trust.

We conclude that the fourth Trust Minute was invalid and the proposed amendment to the Trust was not accomplished on Clifford's purported signature alone. Therefore, the 120-acre farm continued as part of Clifford's Separate Trust Estate and at his death the 120-acre farm became the property of the Dern children as provided in Article 3 of the Trust. Accordingly, we reverse the trial court on this issue and remand for further proceedings.

In reaching this conclusion, we acknowledge that it is inconsistent that Trust Minutes one, two and three, each of which contain only one of the settlor's signatures, have, likewise, not also been invalidated. The short answer to this anomaly is that the parties only chose to litigate the fourth Trust Minute and that is the only Trust Minute at issue here. Moreover, we are not inclined to speculate on why the other three Trust Minutes were not challenged. The fact is they were not, and it would be improper for us to address and decide matters not appealed.

### Issue 3

Did the District Court err in determining the parties' interests in the Family Bypass Trust?

The Trust contained a Family Bypass Trust. The income beneficiary of the Family Bypass Trust is the surviving spouse and the principal beneficiaries are the surviving spouse and Clifford's

13

and Mary's descendants. The District Court found that due to the litigation between the parties the administration of the Family Bypass Trust was "imminently impractical" and that the Family 'Bypass Trust should be terminated and properly allocated to the Trust beneficiaries.

The Family Bypass Trust was to be funded by property allocated to it by the settlors, by the remainder of the deceased spouse's Separate Trust Estate, and by the remainder of the deceased spouse's interest in the Marital Trust Estate. At the time of Clifford's death the settlors had not allocated any property to the Family Bypass Trust. In addition, Clifford specifically bequeathed all of the property held in his Separate Trust Estate to his children, thus there was nothing left in his Separate Trust Estate to fund the Family Bypass Trust. Therefore, the remainder of Clifford's interest in the Marital Trust Estate was the only source of funds in the Family Bypass Trust.

The Dern children appeal the District Court's conclusion that the funeral expenses should be deducted from Clifford's share of the Marital Trust Estate and claim that the expenses should be deducted from the entire Marital Trust Estate, thereby leaving more funds to roll over to the Family Bypass Trust.

The Trust provides:

> The trustee may, in the trustee's reasonable discretion, pay from the trust estate the deceased spouse's debts, last illness and funeral costs, and expenses of administration for this trust and the deceased spouse's probate estate. The trustee may allocate the payment of the deceased spouse's debts to the deceased spouse's interest in the marital trust estate and the deceased spouse's separate trust estate as the trustee determines

14

in the trustee's reasonable discretion.    [Emphasis added.]

Trust,  Article 3, page 4.

The Trust clearly provides that the trustee should pay the funeral costs from the "trust estate."  While the Trust provides that the deceased spouse's debts may be allocated to the deceased spouse's Marital Trust Estate or Separate Trust Estate, it does not allow this option for funeral expenses.  The Trust distinguishes between debts and funeral expenses in the first sentence of the above provision for deceased spouse's expenses.  The next sentence gives the trustee discretion to allocate only the deceased spouse's debts, not funeral expenses, to the deceased spouse's Marital Trust Estate or Separate Trust Estate.  Contrary to the District Court's finding that the second sentence is the more specific provision and should therefore control, we hold that, as to funeral expenses, the first sentence is the more specific and, thus, the controlling provision. Therefore, the funeral expenses should be deducted from the entire Trust estate.  The only funds available in the Trust estate are the funds in the Marital Trust Estate, and therefore the funeral expenses must be deducted from the Marital Trust Estate. The funeral expenses must be deducted before allocation of the Marital Trust Estate into Clifford's and Mary's separate interests.

The District Court correctly subtracted the funeral expenses from the entire Marital Trust Estate rather than from Clifford's interest in the Marital Trust Estate in its supplemental conclusion of law no. 3.  The District Court inexplicably deducted the funeral expenses from Clifford's interest in the Marital Trust Estate in

15

its supplemental findings of fact no. 10. Supplemental finding of fact no. 10 is inconsistent with supplemental conclusion of law no. 3, which is controlling on this question of interpretation.

In determining the amount of money in the Family Bypass **Trust** it becomes necessary to determine Clifford's "interest" in the Marital Trust Estate upon his death. As set out above, the Marital Trust Estate, totalling $73,922.77, consisted of both the Norwest bank accounts and CDs and the Whitefish bank account. The funeral expenses of $4,855 must be deducted from this amount leaving a total of $69,067.77 in the Marital Trust Estate. Mary's costs of bringing this suit and attorney's fees will be deducted from this amount as explained below. After this deduction, the Marital Trust Estate must be divided into the surviving spouse's interest and the deceased spouse's interest.

The Trust fails to elaborate on how to determine respective "interests" in the Marital Trust Estate upon the death of one of the settlors. The District Court, finding that the Norwest accounts were all held in joint tenancy, apportioned half of the value in these accounts to Clifford's interest in the Marital Trust Estate. This apportionment is correct because in Montana, joint tenants are entitled to equal shares of joint property, absent proof to the contrary. Section 70-1-307, MCA; Stapleton v. First Sec. Bank (1983), 2.07 Mont. 248, 256, 675 P.2d 83, 88, appeal after remand 711 P.2d 1364 (remanded to allow the District Court to consider evidence of Stapleton's equitable interest in the proceeds of the sale of her home as part of the proof to rebut the

presumption that as joint payee on checks issued for the sale price of the home she was entitled to one-half or more of the amount of the checks).

The Dern children concede that Clifford's interest in the Norwest accounts is a one-half interest. Because neither party offered evidence to rebut the presumption of equal shares, the District Court's holding that Clifford had a one-half interest in the Norwest accounts is correct.

In its April 21, 1995 Supplemental Findings of Fact, Conclusions of Law and Judgment, the District Court concluded that Clifford and Mary held the Whitefish account as tenants in common and consequently apportioned Clifford's interest in the account according to contribution. The District Court had reached a different conclusion in its May 17, 1994 Findings of Fact and Conclusions of Law, wherein the court' concluded that all of the bank accounts, including the Whitefish account, were held in joint tenancy. Notwithstanding this discrepancy, the District Court accurately apportioned the Whitefish account according to contribution. The District Court's inconsistency in defining the cotenancy status of the Whitefish account is irrelevant because the cotenancy status of the Whitefish account does not dictate the manner of apportionment of the Whitefish account into Clifford's and Mary's respective interests.

It is presumed that shares of cotenants are equal, whether they be tenants in common or joint tenants. 20 Am.Jur. 2d *Cotenancy and Joint Ownership* § 127 .(1995); Poepping v. Monson

17

(1960), 138 Mont. 38, 47, 353 P.2d 325, 330 (citing Ivins v. Hardy (1947), 120 Mont. 35, 40, 179 P.2d 745, 747-48 (overruled on other grounds)). This presumption is not conclusive but is subject to rebuttal and may be rebutted by parol evidence. 20 Am.Jur. 2d Cotenancy and Joint Ownership § 127 (1995); D.M. v. D.A. (Alaska 1994), 885 P.2d 94, 96. See Lawrence v. Harvey (1980), 186 Mont. 314, 322-24, 607 P.2d 551, 556-57. Furthermore, our decision in Stapleton (adhering to the presumption of equal shares in joint tenancy property absent evidence to .the contrary), follows the traditional approach to division of interests of all cotenancies and is persuasive here.

Other states have applied the "equal share presumption rule" to tenancies in common. In D.M., the plaintiffs rebutted the general presumption of equal shares between tenants in common by demonstrating unequal contribution to equity in real property. There the court found that this evidence created a presumption that they intended to share property in proportion to their respective contributions and was enough to rebut the general presumption of equal shares. D.M., 885 P.2d at 97-98. The court held that if the parties intend to hold a tenancy in common in a particular proportion or if an intent to determine proportion by a particular method can be discovered, this intent controls over the equal share presumption rule of cotenancy. D.M., 885 P.2d at 97. Nonetheless, the court recognized that the common law presumptions concerning the respective interests of tenants in common where one contributes 'unequally to the purchase price are not applicable where the

18

relationship between the parties indicates that one might have intended to make a gift to the other. D.M.., 885 P.2d at 97 (citing People v. Varel (Ill. 1932), 184 N.E. 209, 211; Wood v. Collins (Alaska 1991), 812 P.2d 951, 956). In Wood, the court held that where the parties cohabit and share an intimate relationship, it is more likely than otherwise that one party may contribute more of the acquisition or upkeep costs and still expect only an equal share of the property. Wood, 812 P.2d at 956. The court in Wood went on to state that the court must still find, however, that it was in fact the intent of the party making the excess contribution to confer it on the other party as a gift. Wood, 812 P.2d at 957.

Although the above cases involved division of real property held as tenants in common, the same principles pertain to a bank account held as tenants in common. This Court has held that while joint bank accounts have special attributes not applicable to all jointly held property, a joint bank account is otherwise subject to the same rules as other joint tenancies. Casagranda v. Donahue (1978), 178 Mont. 479, 483, 585 P.2d 1286, 1288. As the standard rules of joint tenancies apply to jointly held bank accounts, by analogy, the standard rules of tenancies in common should apply to bank accounts held as tenants in common.

As the above decisions indicate, including the Montana decision in Stapleton, the general rule of equal shares in cotenancies may be rebutted by evidence such as unequal contribution. The burden of proving that an account is owned other than equally between cotenants rests with the party asserting such

claim. Purma v. Stark (Kan. 1978), 585 P.2d 991, 993. The Dern children alleged that a greater amount of the funds in the Whitefish account was attributable to the crop proceeds from Clifford's land than from Mary's land. However, as the decisions in D.M. and Woods indicate, unequal contribution will not always be enough to rebut the presumption of equal shares. Where cotenants are related or cohabit and intend to confer equal shares as a gift to the other cotenant despite unequal contribution the property must be divided in equal shares.

Here, the Dern children rebutted the general rule of equal shares through evidence of unequal contribution. Although Clifford and Mary were married and cohabited, Mary presented no evidence that Clifford clearly intended to confer more than her interest in the Whitefish account as a gift. Although the Whitefish account was used as a joint account and the District Court held, and this Court holds, that the Whitefish account was marital property, it does not necessarily follow that Clifford intended to confer on Mary any more than her contribution upon distribution of the account through the Trust. In fact, as marital property, the Whitefish account became part of the Marital Trust Estate which would be divided into Clifford's interest and Mary's interest upon the death of Clifford. The transfer of the Whitefish account to the Trust which became part of the Marital Trust Estate, indicates that Clifford did not intend to confer his excess contributions upon Mary *as a gift,* but rather intended his share of the Whitefish account to fund the Marital Trust Estate, which would eventually be

divided between the surviving spouse's share and the Family Bypass Trust.

Because the evidence does not clearly prove that Clifford intended to confer his excess contribution to the Whitefish account on Mary as a gift, the exception to the unequal contribution rule (relatives/spouses giving equal interest as gift), does not apply in this situation.   Therefore the Dern children successfully rebutted the general rule of equal interests in a cotenancy and the District Court did not abuse its discretion in apportioning the Whitefish account according to contribution.

Before apportioning the Whitefish account between Clifford's share and Mary's share, appropriate deductions from the account may be necessary to satisfy the funeral expenses, costs, and attorney's fees.   After these deductions, if any, sixty percent of the remainder of the account should be apportioned to Clifford's interest in the Marital Trust Estate and forty percent of the remainder should be apportioned to Mary's interest in the Marital Trust Estate as held by the District Court.

Accordingly, we hold that the District Court's conclusions regarding the specific monetary values of Clifford's and Mary's interests in the Norwest and Whitefish accounts in its supplemental findings of fact nos. 8 through 11 and supplemental conclusion of law No. 3 must be amended to reflect the deductions to be taken from the entire Marital Trust Estate for funeral expenses, costs, and attorney's fees.

## Issue 4

Did the District Court err in denying Mary Dern her costs and attorney's fees?

Mary appeals the District Court's failure to award her costs and attorney's fees. Generally each party to a lawsuit pays its own costs and attorney's fees. Absent a contractual agreement or statutory provision, the prevailing party in a civil action is not entitled to recover attorney's fees. Thompkins v. Fuller (1983), 205 Mont. 168, 186, 667 P.2d 944, 954.

This is a case where contractual provisions govern the awarding of costs and fees. The Trust provides in Article 3 that the trustee may pay from the trust estate the "expenses of administration for this trust . . . ." Additionally, § 72-33-631, MCA, provides that "[a] trustee is entitled to the repayment out of the trust property for . (1) expenditures that were properly incurred in the administration of the trust ."

The Dern children and the District Court rely on § 25-10-103, MCA, for the proposition that imposition of costs is discretionary with the court. However, § 25-10-103, MCA, applies only to situations in which costs are not otherwise provided for. In the present situation, costs are 'provided for in the Trust. Therefore, the District Court did not have discretion to apportion the costs between the parties and the Court's order refusing costs is incorrect. (May 17, 1994 Finding of Fact No. 30 and Conclusion of Law No. 7; April 21, 1995 Supplemental Finding of Fact No. 15 and Conclusion of Law No. 2.)

The costs of bringing this suit were a necessary expense of

22

administering the Trust.  Derril Dern, as co-trustee, refused to sign quitclaim deeds conveying the various properties left to the beneficiaries through the Trust Minutes.  As a result of Derril's intransigence, Mary initiated this litigation.

Furthermore, attorney's fees should be included in the costs of administering the Trust.  Section 72-33-631, MCA, allows for repayment of expenditures incurred by the trustee in the administration of the Trust.  Section 72-33-631 was adopted in 1989 and patterned after California Probate Code § 15684 (1987).  The California decisions interpreting this code provision indicate that reasonable attorney's fees are considered a necessary and reasonable expense of administering a trust where they were incurred in connection with defending or maintaining the Trust. Metzenbaum v. Metzenbaum (Cal. 1953), 252 P.2d 31, 34; In re Spencer's Estate (Cal. 1937), 63 P.2d 875, 876.  Additionally, a trustee is entitled to reimbursement out of the trust estate. Bixby v. Hotchkis (Cal. 1943), 136 P.2d 597, 601.  The California Court of Appeals recently held that it is proper to allow certain ordinary attorney's fees as administrative expenses of a trust, but not extraordinary fees associated with a professional trustee's breach of fiduciary duties:

> absent evidence of fraud or self-dealing, it seems reasonable to allow compensation for services relating to trust assets which were properly managed, denying compensation only for those assets which were administered negligently or in breach of trust.

Matter of Estate of Gump (Cal.Ct.App. 1991), 2 Cal.Rptr.2d 269, 279.

The District Court's conclusion that Mary did not breach her

23

fiduciary duties as trustee is supported by substantial evidence and will not be overturned. The attorney's fees incurred by Mary were necessary to fulfill the Trust purpose and as such constitute expenses of administration.

Including attorney's fees as an expense of administering the Trust is further buttressed by this Court's holding that "expenses" as used in § 72-12-206, MCA (1979), (determining fees and expenses of contested wills and probate), encompassed attorney's fees as part of the expense of the proceedings to confirm the probate of a will. Matter of Estate of Weidner (1981), 192 Mont 421, 425, 628 P.2d 285, 287.

Finally, this Court must ascertain from which part of the Trust to deduct the costs and attorney's fees. Article 3 of the Trust indicates that the expenses of administration should be paid out of the "trust estate" without further specification. Because the Trust does not specify that these expenses should be deducted from the deceased spouse's Marital Trust Estate or Separate Trust Estate as it does for the debts of the deceased spouse, the "trust estate" should be read to signify the entire Trust estate. Because the individual properties have been specifically bequeathed, the Marital Trust Estate is the only source of funding in the Trust estate. The attorney's fees and costs should therefore be deducted from the entire Marital Trust Estate before it is divided into Clifford's and Mary's interests.

Accordingly, we remand to the District Court to redetermine 'the distribution of the Family Bypass Trust after the costs and

24

attorney's fees have been deducted from the total Marital Trust Estate. The funeral expenses must also be deducted from the entire Marital Trust Estate. After these deductions, the Marital Trust Estate should be divided into Mary's interest and Clifford's interest. Mary's interest in the Marital Trust Estate will consist of one-half of the remaining interest in the Norwest accounts and forty percent of the remaining interest in the Whitefish account. Clifford's interest in the Marital Trust Estate, consisting of one-half of the remaining interest in the Norwest accounts and sixty percent of the remaining interest in the Whitefish account will pass into the Family Bypass Trust. The Family Bypass Trust must be revalued according to the above considerations.

## Conclusion

We affirm the District Court's holding that Clifford's interest in the Norwest accounts and the Whitefish account constituted "marital property" and was therefore unavailable to fund the $10,000 bequests to the Dern children.

We reverse the District Court's holding that the fourth Trust Minute, naming Mary as the Trust beneficiary of the 120-acre farm, was a valid amendment to the Trust.

We reverse the District Court's determination that Mary was not entitled to costs and attorney's fees and we remand for a redetermination of the Family Bypass Trust after funeral expenses, costs and attorney's fees have been deducted from the entire Marital Trust Estate in conformity with this opinion.

Affirmed in part, reversed in part and remanded for further

25

proceedings consistent with this opinion.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

Justice James C. Nelson specially concurs.

Given the facts of this case, it is appropriate to make a further observation. If nothing else, our decision here should serve as a warning of the pitfalls of the "canned," "fill in the blanks," "one size fits all" trust instruments that are increasingly being sold to unsuspecting members of the public, particularly senior citizens, by salesmen, many of whom have no professional qualifications whatsoever and some of whom are little better than scam artists.

In this case, the salesman, William W. Thompson, was not licensed to practice law; he had no legal training; and he was, in all probability, unlawfully practicing law in this State in violation of Title 37, Chapter 61 of the Montana Code. He was, quite properly, ridden out of the states of Washington and Idaho on a rail for deceitful, manipulative and unscrupulous conduct. Unfortunately, he got off the train in Montana.

According to the record, over a five-year period, Thompson sold approximately 200 living trusts in Idaho, Washington and Montana. The price of the living trust sold to the Derns was over $2,000. After Thompson sold the Derns their trust, his employer, American Family Living Trust, was dissolved.

The Trustee Instructions, among other things, tout the trust instrument sold to the Derns in the following glowing, folksy terms:

> Deciding to avoid probate, the costly process of court supervised administration of your estate, and the long delays and unwanted publicity associated with

27

Justice W. William Leaphart, dissenting.

I dissent from the conclusion reached in Issue 2 regarding the validity of the bequest of the family farm via the fourth "Trust Minute." I disagree that we should allow the narrow instructional language found only in the Trust Minutes to control the method of amendment of the Trust and defeat the settlors' intent where the amendment provisions throughout the Trust are ambiguous.

Article 2 of the Trust provides for amendment to the Trust through the Trust Minutes. The Trust Minutes, as noted in the "Trust Summary," are an informal means of amending the Trust and direct the settlors to "simply include in the minutes" the settlors' desires so "successor trustee can give effect. . ." The instructions in the Trust Minutes indicate that the Minutes should be signed by both settlors.

On the other hand, Article 2 of The Trust provides:

> Clifford Dern and Mary R. Dern <u>acting together</u> may at any time during their joint lives amend any of the terms of this trust by a written document delivered to the trustee or including such amendment in the Minutes of Trust.

(Emphasis added.)

While acknowledging that the Minute instructions employ narrower language than the amendment directions in the Trust document itself, the Trust must be construed as a whole to give effect to the settlors' intent. When construction questions cannot be resolved by reference to a clause alone, the court may examine the entire trust instrument to determine the creator's intent and purposes, and in some cases apply statutory or court rules of

29

construction. Bogert, Trusts and Trustees § 182 (2d ed. 1979). Although statutory rules exist for the proposition that where general and particular provisions of an instrument are inconsistent, a particular intent will control, § 1-4-103, MCA, the conflicting provisions in this Trust are not inconsistent, but merely ambiguous. In interpreting ambiguous terms of a contract to determine the intent of the parties, particular clauses are subordinate to its general intent. Section 28-3-307, MCA. Therefore, the "acting together" language controls the method of amendment.

From the handwriting on the Trust document and the Minutes it is evident that Clifford and Mary were acting together when they amended the Trust via the Minutes. On page 4 of the Trust, Article 3, the paragraph allocating four parcels of land to Clifford's children, including two 160-acre wooded parcels, one-half of the 360-acre parcel of timber land harvested by Clifford and his son, and the 120-acre farm at issue, is crossed out with an "X." The marginalia states, "See Minutes" and both Clifford's and Mary's initials appear in the margin.

The first Trust Minute gives Mary's property to her two children. It is signed by Mary and dated November 14, 1991. The following two Minutes give each of Clifford's children a separate parcel of property. These Minutes are signed by Clifford and dated November 14, 1991. The last Minute gives the 120-acre farm, which is in dispute, to Mary. It is signed by Clifford Dern and dated November 14, 1991. All of the Minutes were signed by either Mary

30

or Clifford Dern on the same day.  The marginalia in Article 3 of the Trust is dated November 15, 1991, and initialed by both Mary and Clifford Dern.  These facts alone indicate that Clifford and Mary were acting together when they amended the Trust.

Because the instructions in the Trust Minutes (requiring both settlors' signatures) differ from the language in Article 2 of the Trust (requiring that the settlors "act together"), there is an ambiguity within the Trust document as to how the Trust may be amended.  Therefore, extrinsic evidence may be examined to determine the intent of the parties to the Trust.  Ellingson Agency, Inc. v. Baltrusch (1987), 228 Mont. 360, 365, 742 P.2d 1009, 1012.

Thompson, who sold the Trust to the Derns, was asked to come to the Dern Farm for the purpose of making the amendments to the Trust.  Be instructed the Derns to make the amendments via the Minutes and assisted Clifford Dern in writing out the property descriptions in the Minutes.

The Derns signed the Minutes one after the other in each other's presence and in the presence of and upon the instruction of their trust advisor, Thompson.  The Derns deleted the original allocation of properties in the Trust document the next day in Thompson's presence.  Both Clifford and Mary initialed and dated the deletion and the marginalia which read "See Minutes."  The District Court was correct in holding that the Trust could be modified by the settlors acting together through the use of the Minutes as called for in Article 2 of the Trust.  The above facts

31

indicate that the two settlors were, in fact, "acting together" when they amended the Trust via the Minutes.

In conclusion, I find it extremely curious that the Court turns a blind eye to the fact that, although all four Trust Minutes were signed by only one settlor, the first three minutes were honored. Nevertheless, this Court invalidates the fourth minute for the reason that it does not contain both signatures. Apparently the Court reads the Trust as requiring that every fourth minute be signed by both settlors.

I would affirm the District Court's conclusion that the fourth Trust Minute was validly executed.

_____
Justice

Justices William E. Hunt, Sr. and Terry N. Trieweiler join in the foregoing dissent.

_____
_____
Justices

32